Exhibit B

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is made as of the 1st day of December 2002 by and among Ocean Power Corporation, a Delaware corporation, having a place of business at 5000 Robert J. Mathews Parkway, El Dorado Hills, California 95762 ("Seller"), Algonquin Capital Management L.L.C. ("Algonquin"), a Connecticut limited liability company, having a place of business at 440 Main Street, Ridgefield, CT 06877 and Hibernia Capital Management L.L.C. ("Hibernia"), a Delaware limited liability company, having a place of business at 440 Main Street, Ridgefield, CT 06877 (together, the "Purchaser").

## W I T N E S S E T H:

WHEREAS, Seller intends to file a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, Seller currently owns certain assets used by the Seller in the distributed power generation and seawater desalination businesses (the "Business");

WHEREAS, Purchaser desires to purchase certain assets from Seller, including without limitation, certain intellectual property assets, and Seller desires to sell, convey, assign, and transfer to Purchaser, such assets (as defined in Section 1.1 below, the "Assets"), pursuant to the terms of this Agreement; and

WHEREAS, the Assets will be sold pursuant to the terms of this Agreement and an order of the Bankruptcy Court approving such sale under Sections 105, 363 and 365 of the Bankruptcy Code (the "Sale Order").

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

1. Purchase and Sale.

1.1.    Assets To Be Sold and Purchased.    Subject to the terms and conditions of this Agreement, Seller agrees to sell, convey, assign and deliver to Purchaser and Purchaser agrees to purchase from Seller at a Closing (as hereinafter defined), all of the right, title and interest to and under the Assets (as defined below), as the same shall exist as of the Closing, free and clear of all Encumbrances (as defined below). For purposes of this Agreement, "Assets" shall mean the assets described on Schedule 1.1 annexed hereto and made a part hereof including, without limitation, all intellectual property (including applications and registrations therefor) and related assets owned by Seller. For purposes of this Agreement, "Encumbrance" shall include but not be limited to any claim, judgment, lease, sublease, lien, pledge, option, charge, easement, license, security interest, conditional sales agreement, title retention arrangements which are intended as security, encumbrance or other right of third parties, whether voluntarily incurred or arising by operation of law, and includes, without limitation, any

9335599.4

agreement to give any of the foregoing in the future, any contingent sale or other title retention agreement or lease in the nature thereof, and any "claim", "lien", or "security interest" as those terms are defined in the Bankruptcy Code.

        1.2.   <u>Excluded Assets</u>. All the assets of Seller which are not included as the Assets hereunder shall remain the assets of Seller and shall not be sold or conveyed hereunder (the "Excluded Assets"). At any time prior to the Closing, Purchaser may deem any of the Assets to be Excluded Assets.

        1.3.   <u>Excluded Liabilities</u>. Except for the Assumed Liabilities (as defined in Section 2.2(c) below), Purchaser shall not assume and Seller shall indemnify and hold Purchaser harmless from and against any losses relating to or arising out of any obligation or liability of the Seller or any kind, whether fixed, contingent, known or unknown, and whether existing as of the Closing or arising thereafter.

        1.4.   <u>Condition of the Assets</u>. Except as otherwise stated in this Agreement, Purchaser is taking the Assets on an "as is, where is" basis, without representation or warranty of any kind whatsoever.

        2.  <u>Purchase Price</u>.

        2.1.   <u>Amount of Purchase Price</u>. In consideration for the Assets, the aggregate purchase price payable by Purchaser to Seller for the Assets (the "Purchase Price") shall be Two Million United States Dollars ($2,000,000 U.S.D.).

        2.2.   At the option of Purchaser, the Purchase Price may be payable, in whole or in part, to Seller as follows:

        (a)   the assignment, as determined by Purchaser in its sole discretion, to Seller of all or part of Purchaser's right, title and interest in, and/or claims (including all principal, interest and other amounts payable) relating to or arising out of (i) the $2,500,000 Promissory Note and Guaranty dated March 5, 2001 executed by Seller in favor of Algonquin, (ii) the $ 500,000 Promissory Note and Guaranty dated March 5, 2001 executed by Seller in favor of Hibernia (iii) the $20,000 Senior Secured Demand Promissory Note dated August 16, 2002 executed by Seller in favor of Algonquin, (iv) the $15,000 Senior Secured Demand Promissory Note dated August 23, 2002 executed by Seller in favor of Algonquin, (v) the $15,000 Senior Secured Demand Promissory Note dated August 29, 2002 executed by Seller in favor of Algonquin, each of the notes referred to in clauses (i), (ii), (iii), (iv) and (v) above pursuant to an assignment executed by Michael D. Lockwood and John V. Doyle the original holder of such notes, in favor of Purchaser, and (vi) any other notes or agreements evidencing indebtedness of Seller to Algonquin, Hibernia or any Permitted Assignee thereof (as defined in <u>Section 9.5</u> below).

        (b)   the assumption of certain assumed liabilities as set forth on <u>Schedule 2.2(b)</u> annexed hereto and made a part hereof (the "Assumed Liabilities").

2.3     Nothing contained in this Agreement shall require Purchaser to pay, perform or discharge any Assumed Liability so long as it shall in good faith contest or cause to be contested the amount or validity thereof.

3.   Closing.

3.1.     Closing.  The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York at 10:00 a.m. on the earlier of (i) the first business day after the conditions set forth in Section 7 hereof are satisfied or waived and (ii) such other time, date, and place as shall be agreed upon by the parties (the date of the Closing being herein referred to as the "Closing Date").

3.2.     Deliveries by Seller.   Seller shall deliver to Purchaser at the Closing the following:

(a)     Bill of sale in substantially the form of Exhibit A hereto;

(b)     Assignment to Purchaser in substantially the form of Exhibit B hereto; and

(c)     Such other documents as Purchaser may reasonably request to effect the transactions contemplated herein.

3.3.     Deliveries By Purchaser.   Purchaser shall deliver the Purchase Price to Seller at the Closing.

4.   Representations and Warranties of Seller.  The Assets will be sold "AS IS, WHERE IS" with all faults and without any express or implied representations or warranties whatsoever, including, without limitation, warranties of merchantability, quite enjoyment or fitness for a particular purpose or as to the title, value or quality of the Assets, except:

4.1.     Organization and Standing of Seller.  Seller is a corporation duly organized and/or validly existing under the laws of the State of Delaware.

4.2.     Authority Relative to this Agreement.  This Agreement has been duly and validly authorized, executed and delivered by Seller and (assuming this Agreement constitutes valid and binding obligations of Purchaser) constitutes a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, subject only to the entry of the Sale Order (as defined below).

4.3.     No Licenses.  Seller has not granted or conveyed to any other person or entity any license under or ownership interest in the Assets, and there are no licenses or other claims of entitlement, either actual or implied, to exploit the Assets.

4.4.     Assets.

9335599.4

(a)    Seller and each of its subsidiaries owns and has good, valid and marketable title to all of the Assets.

(b)    The Assets include all rights, properties and other assets used by Seller and its subsidiaries to conduct the Business or necessary or valuable to Purchaser's ability to (1) pursue the development of the Business and related business plans developed by Seller and (2) conduct the Business after the Closing in all material respects in the same manner as such Business has been conducted by Seller and its subsidiaries prior to the date hereof.

(c)    Upon consummation of the transactions contemplated hereby and in accordance with a Final Order approving such transactions Purchaser will have acquired good and marketable title in and to, or assignment of the Assets, free and clear of all Encumbrances.

    5.    <u>Representations and Warranties of Purchaser</u>.  Purchaser represents and warrants to Seller:

        5.1.    <u>Organization and Standing of Purchaser</u>.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Connecticut and has the right, power, and authority and all necessary governmental approvals to own, lease and operate its properties and to carry on its business as it is now being conducted or presently proposed to be conducted.

        5.2.    <u>Power and Authority of Purchaser</u>.  Purchaser has the right, power, and authority to enter into this Agreement and the other documents and transactions contemplated hereby.  The execution, delivery and performance of this Agreement and all of the documents in connection herewith by Purchaser have been duly and validly authorized, and all requisite action has been taken to make them valid and binding upon Purchaser in accordance with their respective terms.  This Agreement and the other documents executed and delivered by Purchaser pursuant hereto constitute the legal, valid and binding obligations of Purchaser, enforceable in accordance with their respective terms, subject only to entry of the Sale Order.

        5.3.    <u>Consents and Approvals</u>.  No consent, approval, or authorization of, or declaration, filing or registration with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Purchaser in connection with its execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby.

        5.4.    <u>No Conflict</u>.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby or thereby will violate or conflict with any provision of the organizational documents of Purchaser or constitute a breach or default under any contract, instrument, agreement, indenture, license, law, order, regulation or judgment to which Purchaser is a party or by which it may be bound or affected.

6.    <u>Covenants.</u>

6.1.    <u>Conduct of Business by Seller Pending the Closing.</u>  Between the date of execution of this Agreement and the Closing, Seller shall not take any action inconsistent with the timely consummation of the transactions contemplated hereby.  In addition, Seller shall use its best efforts to ensure that, and Seller covenants and agrees that, after the date hereof and prior to the Closing Date, except as (i) expressly provided in this Agreement, or (ii) may be agreed in writing by Purchaser:

(a)    (x) the Business shall be conducted in the same manner as heretofore conducted and only in the ordinary course and (y) each of Seller and any subsidiary of Seller shall use its best efforts to preserve the business organization of the Business intact, keep available the services of the current officers and employees of the Business and maintain the existing relations with customers, suppliers, creditors, business partners, employees and others having business dealings with the Business;

(b)    Seller and any subsidiary of Seller shall use its best efforts to (1) maintain, preserve and protect all of the Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear, (2) preserve, protect and prosecute all intellectual property rights and similar interests related to the Business and (3) cooperate with Purchaser with respect to Purchaser's efforts to accomplish the foregoing;

(c)    neither Seller nor any subsidiary of Seller shall file with the Bankruptcy Court any pleading seeking authority to reject, or to assume and assign to any party other than Purchaser, any lease or executory contract constituting an Asset to be acquired hereunder by Purchaser;

(d)    neither Seller nor any subsidiary of Seller shall enter into any employment or other agreement with or make any loan or advance to, any officers or employees or hire any employees except as expressly set forth under the budget (the "Budget") as annexed to the Credit Agreement (as defined herein);

(e)    neither Seller nor any subsidiary of Seller shall take, or agree to or commit to take, any action that would or is reasonably likely to result in any of the conditions to the Closing set forth in Section 7 not being satisfied, or would make any representation or warranty of Seller contained herein inaccurate in any respect at, or as of any time prior to, the Closing Date, or that would materially impair the ability of Seller or Purchaser to consummate the Closing in accordance with the terms hereof or materially delay such consummation;

(f)    neither Seller nor any subsidiary of Seller shall take any action which would have or reasonably be expected to have, individually or in the aggregate, a material adverse effect;

(g)    except upon written consent of Purchaser, neither Seller nor any subsidiary shall (i) amend, supplement or otherwise modify, waive any rights under or terminate any contract of the Seller or (ii) enter into any new contract, either written or oral, with any third party;

(h)    neither Seller nor any subsidiary of Seller shall make any capital expenditure in excess of $5,000 individually or $10,000 in the aggregate except as set forth on the Budget (as defined in the Credit Agreement dated December 1, 2002, between Seller and Purchaser (the "Credit Agreement")); and

(i)    neither Seller nor any subsidiary of Seller shall enter into any agreement, contract, commitment or arrangement to do any of the foregoing or to violate any of the foregoing, or authorize, recommend, propose or announce an intention to do or violate any of the foregoing.

Notwithstanding anything in this Section 6.1 to the contrary, Seller shall only be required to take actions under subsections (a) and (b) hereof that have associated costs to the extent that there is sufficient funding for such costs available under the Credit Agreement, provided, however, that if such funding is not available under the Credit Agreement, Seller shall at all times be required to give Purchaser sufficient notice of any such actions that would be required to fully perform under this section 6.1 such that Purchaser may perform such actions for or in place of Seller.

6.2.    Consents and Best Efforts.

(a)    Upon entry of the Sale Order, and subject to the terms of this Agreement, Seller shall take all reasonable actions required to obtain at the earliest practicable date all consents, permits, waivers, approvals, authorizations and agreements of, and promptly to give all notices to, effect all registrations pursuant to, and make all other filings with or submissions to, any third parties, including, without limitation, governmental and regulatory authorities, necessary or advisable to authorize, approve or permit the consummation of the transactions contemplated hereby.  Purchaser shall furnish to Seller such necessary information and reasonable assistance as Seller may request in connection with the preparation of all necessary filings with any third parties, including, without limitation, governmental and regulatory authorities.

(b)    Each of the parties hereto covenants and agrees, upon the terms and subject to the conditions contained herein, to pursue diligently and in good faith and use all best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated hereby, subject to the terms and conditions of this Agreement.  Notwithstanding the foregoing or any other covenant contained herein, nothing in this Agreement shall be deemed to require Purchaser to (1) commence any litigation against any person in order to facilitate the consummation of the transactions contemplated hereby, (2) take or agree to take any other action or agree to any limitation that could reasonably be expected to have a material adverse effect on the Business, the Assets or Purchaser's business plans with respect thereto or (3) defend any litigation brought by any person seeking to prevent the consummation of, or impose limitations on, any of the transactions contemplated hereby.

Notwithstanding anything in this Section 6.2 to the contrary, Seller shall only be required to take actions under subsections (a) and (b) hereof that have associated costs to the

extent that there is sufficient funding for such costs available under the Credit Agreement, provided, however, that if such funding is not available under the Credit Agreement, Seller shall at all times be required to give Purchaser sufficient notice of any such actions that would be required to fully perform under this section 6.2 such that Purchaser may perform such actions for or in place of Seller.

6.3.    Further Assurances.    In addition to the provisions of this Agreement, from time to time after the Closing Date, Seller and Purchaser will use all best efforts to execute and deliver such other instruments of conveyance, transfer or assumption, as the case may be, and take such other actions as may be reasonably requested to implement more effectively, the conveyance and transfer of the Assets to Purchaser.

6.4.    Access.

(a)    Between the date of this Agreement and the Closing, on no less than twenty-four (24) hours prior notice from Purchaser, Seller shall (i) afford Purchaser and its authorized representatives reasonable access, during regular business hours, to all offices and other facilities, all books and records and all employees and personnel of Seller and its subsidiaries, (ii) permit Purchaser and its authorized representatives to make such inspections and to make copies of such books and records as they may reasonably require and (iii) furnish Purchaser and its authorized representatives with such financial and operating data and other information concerning the Business as they may from time to time reasonably request.  Each party will direct its employees to render any assistance which the other party may reasonably request in examining or utilizing records referred to in this Section 6.4.

(b)    After the Closing, Purchaser shall cooperate with Seller, at no cost and make available to Seller such documents, books, records or information transferred to Purchaser and relating to activities of the Business, Seller or any of its subsidiaries prior to the Closing as Seller may reasonably require after the Closing in connection with the administration of the Chapter 11 case, any tax determination or contractual obligations to third parties or to defend or prepare for the defense of any claim against Seller or any subsidiary or to prosecute or prepare for the prosecution of claims against third parties by Seller relating to the conduct of the Business by Seller or any subsidiary prior to the Closing or in connection with any governmental investigation of Seller or any of its affiliates.

(c)    No party shall destroy any files or records which are subject to this Section 6.4 without giving reasonable notice to the other party, and within 15 days of receipt of such notice, such other party may cause to be delivered to it the records intended to be destroyed, at such other party's expense.

6.5.    Bidding Procedures.  Set forth on Schedule 6.5 are the bidding procedures to be employed with respect to this Agreement concerning the sale of the Assets to Purchaser.  At all times, Purchaser shall have the right to bid at any auction for the sale of the Assets and/or make one or more counter proposals to any offers received by Seller for the Assets.

9335599.4

6.6.    Submission for Court Approval.

(a)    Within one business day of the execution of this Agreement (the "Petition Date"), Seller shall file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.  On the Petition Date, Seller shall file with the Bankruptcy Court a motion and supporting papers (including a proposed order, the "Sale Motion"), in form and substance satisfactory to Purchaser, seeking the entry of the Sale Order by the Bankruptcy Court approving all of the terms of this Agreement and all transactions herein; including, without limitation, the Bidding Procedures.  Seller shall use its best efforts to have the Bankruptcy Court enter the Sale Order and such Sale Order shall not have been stayed, modified, reversed or amended and shall have become a final, non-appealable order of the Bankruptcy Court (a "Final Order") by no later than January 24, 2003 (the "Outside Date").  In the event that the Sale Order is not a Final Order by the Outside Date, Purchaser shall have the right to terminate this Agreement and seek any damages arising from such termination.

(b)    Seller shall provide Purchaser with advance copies of any and all motions, applications, pleadings, schedules, statements, reports and other papers (including exhibits and supporting documentation) to be filed by or on behalf of Seller or any subsidiary of Seller in the Bankruptcy Case(s).

(c)    Seller shall provide the requisite notice, and provide an opportunity to be heard, to all parties entitled thereto, of all motions, orders, hearings or other proceedings relating in any manner to this Agreement or the transactions contemplated hereby.  Seller shall provide timely notice to any additional party designated by Purchaser.

(d)    Notice of the Sale Motion, the Sale Hearing (as defined below), and the deadline for the filing and service of objections, if any, to the Sale Motion shall be served by Seller in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure and any applicable local rules of the Bankruptcy Court on all persons required to receive notice under such rules including, without limitation, all persons which have asserted Encumbrances or other interests in the Assets, all non-debtor parties to the Assets, all official committees appointed in the Bankruptcy Case, the office of the United States Trustee, applicable taxing environmental and regulatory authorities, and each of Seller's known creditors, including but not limited to:

(i)    all creditors, at the time of service, who have filed proofs of claim in the Bankruptcy Case; and

(ii)    all creditors who, at the time of service, have filed a request for all notices or otherwise appeared in the Bankruptcy Case as of the date of service of the Sale Motion.

7.    Conditions Precedent.

7.1.    Conditions Precedent to Obligations of Seller and Purchaser.  The respective obligations of each party to effect the transactions contemplated by this Agreement shall be subject to the satisfaction of the following condition:  the Sale Order, in form and substance consistent with this Agreement and acceptable to Purchaser, shall have been entered

by the Bankruptcy Court, and such Sale Order shall have become a Final Order; provided, however, that if such order is stayed, modified or amended, and the stay is lifted, or after the order is modified or amended, the order remains in form and substance consistent with this Agreement and acceptable to Purchaser, then this condition shall be deemed to be satisfied.

7.2.    Conditions Precedent to Obligation of Seller.  The obligation of Seller to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following additional conditions: Purchaser shall have performed in all material respects its obligations under this Agreement required to be performed by Purchaser at or prior to the Closing Date including, without limitation, delivery of the Purchase Price and the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date as if made at and as of such date, except as otherwise contemplated by this Agreement.

7.3.    Conditions Precedent to Obligation of Purchaser.  The obligation of Purchaser to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following additional conditions, any of such may be waived (in whole or in part) by the Purchaser in accordance with Section 9.8 hereof.

(i)    Representations, Warranties and Covenants.  All representations and warranties of Seller contained in this Agreement shall be true and correct as of the date of this Agreement and as of and at the Closing Date if such representations and warranties were made at and as of the Closing Date, and Seller shall have performed all agreements and covenants required hereby to be performed by the Seller prior to or at the Closing Date.

(ii)    Consents.  Any consents, approvals, waivers and permits from third parties and governmental regulatory authorities required to consummate the transactions set forth herein or contemplated hereby, if any, shall have been obtained.

(iii)    No Proceedings or Litigation.  No actions by any governmental authority or other person shall have been instituted or threatened for the purpose of enjoining or preventing, or which question the validity or legality of, the transactions contemplated hereby and which could reasonably be expected to damage Purchaser materially or to damage materially the value of any of the Assets or the Business.

(iv)    Instruments of Conveyance.  Seller shall have executed and delivered to Purchaser all of the documents reasonably requested as contemplated in Section 3.2 above.

(v)    Entry of Sale Order.  The Sale Order shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to Purchaser and its counsel and shall have become a Final Order.  Without limiting the foregoing, the Sale Order shall (i) include a finding that Purchaser is a good

faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code, (ii) Purchaser is obtaining the Assets free and clear of all Encumbrances and (iii) the transactions contemplated hereunder shall not be avoidable under Section 363(n) of the Bankruptcy Code.

(vi)    No Default.  There shall be no default, event of default by Seller, or act, occurrence or omission that would give rise to the termination hereof by Purchaser hereunder or pursuant to the Credit Agreement.

8.  Termination.

8.1.    Termination.  This Agreement may be terminated:

(i)    by mutual written agreement of Seller and Purchaser at any time prior to the Closing Date;

(ii)    by Seller if any of the conditions set forth in Section 7.2 shall have become incapable of fulfillment or cure and shall not have been waived by Seller after receipt of notice within five (5) business days thereafter, provided Seller is not then in breach of this Agreement;

(iii)    by Purchaser if any of the conditions set forth in Section 7.3 shall have become incapable of fulfillment or cure and shall not have been waived by Purchaser provided that Purchaser is not then in breach of this Agreement; or

(iv)    by Purchaser, if the Sale Order has not become a Final Order by January 24, 2003.

9.  General Provisions.

9.1.    Survival of Representations, Warranties and Agreements.  No representations or warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date.

9.2.    Taxes.  Seller shall be responsible for all federal, state, county and municipality taxes, imposed by reason of the sale, transfer, assignment, conveyance and delivery of the Assets provided hereunder and all deficiencies, interest or penalties asserted, incurred or assessed with respect thereto, and Purchaser shall pay the fees and costs of recording or filing all applicable conveyancing instruments described in Section 3.2.  Purchaser and Seller will cooperate in an effort to exempt the transfer of the Assets from any such transfer taxes pursuant to Section 1146(c) of the Bankruptcy Code.

9.3.    Notices.  All notices, demands, and other communications hereunder shall be in writing and shall be deemed given upon (a) confirmation of receipt of a facsimile transmission, (b) confirmed delivery by a standard overnight carrier or when delivered by hand, or (c) the expiration of five (5) business days after the date when mailed by registered

or certified mail (postage prepaid, return receipt requested), addressed to the respective parties at the following addresses (or such other address for a party as shall be specified by like notice):

If to Seller, to:

Ocean Power Corporation
123 Seventh Avenue
#187
Brooklyn, NY 11215
Attention: Joseph P. Maceda

With a copy to:

Halperin and Associates, LLP
1775 Broadway
Suite 515
New York, NY 10019
Fax:    (212) 765-0964
Attention:    Alan D. Halperin, Esq.,
              Robert D. Raicht, Esq.

If to Purchaser, to:

Algonquin Capital Management L.L.C.
Hibernia Capital management L.L.C.
440 Main Street
Ridgefield, CT  06877
Telecopy: (203) 894-8484
Attention: Michael D. Lockwood

With a copy to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York  10022
Telecopy: (212) 593-5955
Attention: Michael R. Littenberg, Esq.

      9.4.    <u>Descriptive Headings</u>.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

      9.5.    <u>Entire Agreement, Assignment</u>.  This Agreement (including the Schedules, Exhibits and the other documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, among the parties or any of them, with respect to the subject matter hereof, including, without limitation, any transaction between or among the parties hereto.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties

hereto (whether by operation of law or otherwise) without the prior written content of the other party, except that Purchaser may assign, in its sole discretion, any or all of its rights, obligations and interests hereunder to Hibernia Capital Management LLC or any entity controlled by either Michael D. Lockwood and John V. Doyle (each, a "Permitted Assignee"). Subject to the second sentence of this Section 9.5, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns including, but not limited to trustee, responsible person appointed for the Seller in the Bankruptcy Case. In the event that any rights of Purchaser are assigned to any Permitted Assignee, any notes evidencing indebtedness of Seller to such Permitted Assignee may be assigned to Seller for the purposes of paying all or any portion of such Permitted Assignee's share of the Purchase Price in accordance with Section 2.2 (a) above, and any allocation of any Assumed Liabilities, if any, shall be as determined by the mutual agreement of Purchaser and any such Permitted Assignee.

      9.6.   <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction. Each of the parties hereto irrevocably and unconditionally consents to the jurisdiction of the courts of New York and the United States of America located in such state, including the Bankruptcy Court, for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in such courts), waives any objection to the laying of venue of any such litigation therein, and agrees not to plead or claim that such litigation has been brought in an inconvenient forum.

      9.7.   <u>Expenses</u>.  Whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such expenses. The foregoing shall not affect the legal right, if any, that any party hereto may have to recover expenses from any other party that breaches its obligations hereunder.

      9.8.   <u>Amendment</u>.  This Agreement may not be amended except by an instrument in writing signed on behalf of all the parties hereto.

      9.9.   <u>Waiver</u>.  At any time prior to any Closing Date, the parties hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

      9.10.  <u>Counterparts; Effectiveness</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement. This Agreement shall become effective when each party hereto or their counsel shall have received counterparts thereof signed by the other parties hereto. Facsimile signatures shall be valid and treated as if originally executed.

9335599.4

9.11.    <u>Severability; Validity; Parties in Interest</u>.  If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other persons or circumstances, shall not be affected thereto, and to such end, the provisions of this Agreement are agreed to be severable.  Nothing in this Agreement, express or implied, is intended to confer upon any person not a party to this Agreement any rights or remedies of any nature whatsoever under or by reason of this Agreement.

9.12.    <u>Bulk Sales</u>.  Purchaser hereby waives compliance with any bulk sales or other similar laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed on their behalf by their officers thereunto duly authorized, as of the date first above written.

OCEAN POWER CORPORATION

By: /s/ Joseph P. Maceda
    Name: Joseph P. Maceda
    Title:  President


ALGONQUIN CAPITAL MANAGEMENT L.L.C.

By: /s/ Michael D. Lockwood
    Michael D. Lockwood


HIBERNIA CAPITAL MANAGEMENT L.L.C.

By /s/ John V. Doyle
    John V. Doyle

## SCHEDULE 1.1

### DESCRIPTION OF ASSETS

(a) all Intellectual Property;

(b) all rights of Seller in and to (1) all confidentiality agreements (under which Seller or any Subsidiary of Seller has provided information to a Third Party and with no substantive continuing obligation of Seller or any Subsidiary of Seller thereunder), (2) all purchase orders for the sale or purchase of goods or services from Seller or any Subsidiary of Seller, (3) all agreements with employees or consultants of Seller pursuant to which such employees or consultants have (x) undertaken confidentiality obligations with respect to Seller's business or assets or (y) commitments to confer upon Seller such consultant's or employee's rights with respect to any inventions or other Intellectual Property, except to the extent that any such agreement requires any payment or material future performance in order for Seller (or any Subsidiary of Seller) to obtain the benefits thereunder, (4) Agreement dated September 6, 2002 between Seller and Oases International Services Corporation, (5) Bill of Sale dated June 26, 2002 executed by Eletryon, Inc. (including all assets identified in the appendix thereto), (6) Heads of Agreement and Affiliate Systems Guidelines between Seller and CIMA Capital, LLC dated March 30, 2000, (7) Joint Venture Agreement between Seller and Apollo Water and Power International, Inc. dated February 23, 2001 and (8) Joint Venture Agreement between Seller and Carribean Water and Power, Inc. dated February 23, 2001   (collectively, the "Contracts") (collectively, the "Contracts");

(c) all books, files, data, customer and supplier lists, customer information, cost and pricing information, business plans, quality control records and manuals, blueprints, research and development files, personnel records and all other records of Seller;

(d) all personal computers, computer hardware, technical equipment, testing equipment and software of Seller;

(e) all prototypes, inventory, supplies, finished goods, works in process, goods-in-transit, packaging materials and other consumables of Seller (the "Inventory"), including Inventory (A) in transit from suppliers of the Business or (B) held by suppliers;

(f) all government permits of Seller;

(g) all machinery, vehicles, tools, equipment, furnishings, office equipment, fixtures, furniture, spare parts and other fixed Assets owned by Seller including, without limitation, the assets listed on Annex 2 hereto;

(h) all advertising or promotional materials of Seller;

(i) all manufacturer's warranties to the extent related to the Assets and all claims under such warranties;

9335599.4

(j) all rights to the telephone numbers (and related directory listings), Internet domain names, and Internet sites used by Seller;

(k) all prepaid expenses and deposits of Seller;

(l) all tax refunds and recoveries and similar benefits of Seller;

(m) all rights, privileges, claims, causes of action, demands, choses in action, prepayments, deposits, refunds, indemnification rights against Third Parties, warranty claims (to the extent transferable) against third parties, offsets and other claims of Seller against third parties;

(o) all security deposits, earnest deposits and all other forms of security placed with Seller for the performance of a contract or agreement which otherwise constitute a portion of the Assets;

(p) all investments;

(q) all stock and other securities in corporations, partnerships, limited liability companies or other entities owed by Seller or to which Seller is entitled, including without limitation, the subsidiaries listed on Annex 3 hereto;

(r) all rights with respect to bank accounts of Seller;

(s) all insurance policies for the benefit of Seller or in respect of the business of Seller or Assets and all rights of every nature and description under or arising out of such policies;

(t) all accounts receivable; and

(u) customer relationships, supplier relationships, governmental relationships, the goodwill and all other intangible assets relating to, symbolized by or associated with the business or activities of Seller or any Subsidiary of Seller.

As used in this Schedule 1.1, the following terms shall have the following meanings:

"Intellectual Property" shall mean all of the following: Trademarks, Patents (including any registrations, continuations, continuations in part, renewals and applications for any of the foregoing), copyrights (including any registrations and applications for any of the foregoing), Trade Secrets, software and databases used in or necessary for the conduct of the Business as currently conducted or contemplated to be conducted.

"Patents" means all patents, patent applications and foreign counterparts thereof.

"Subsidiary" shall mean, with respect to any person, any corporation or other organization, whether incorporated or unincorporated, of which (a) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the Board of

Directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such person or by any one or more of its Subsidiaries, or by such person and one or more of its Subsidiaries or (b) such person or any other Subsidiary of such person is a general partner (excluding any such partnership where such person or any Subsidiary of such party does not have a majority of the voting interest in such partnership).

"Trademarks" means any foreign or U.S. trademarks, service marks, trade dress, trade names, brand names, designs and logos, corporate names, product or service identifiers, and general intangibles of like nature whether registered or unregistered, together with all of the goodwill relating thereto and all registrations and applications for registration thereof.

"Trade Secrets" means any confidential information, trade secrets, research records, processes, procedures, manufacturing formulas, technical know-how, technology, blue prints, designs, plans, models and methodologies (whether patentable and whether reduced to practice), invention disclosures and improvements thereto.

**SCHEDULE 2.2(b)**

**ASSUMED LIABILITIES**

None

## SCHEDULE 6.5

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to this Agreement and the transfer of all Assets under the Agreement to Purchaser (the "Sale"). The Sale is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court at a hearing under Sections 363 and 365 of the Bankruptcy Code (the "Sale Hearing"). The following alternative bid provisions and related bid protections are designed to facilitate a full and fair process designed to maximize the value of the Assets:

a.  Alternative Bid Deadline. All alternative bids must be submitted to (a) the Debtor, c/o its proposed bankruptcy, Halperin & Associates, 1775 Broadway, Suite 515, New York, New York 10019, Attn: Robert D. Raicht, Esq., and (b) the Purchaser, c/o its counsel, Schulte Roth & Zabel, LLP, 919 Third Avenue, New York, New York 10022 Attn: Andrew R. Gottesman, Esq., not later than 5 PM (ET) within five (5) days prior to the Sale Hearing (the "Alternative Bid Deadline").

b.  To the extent any proposed bidder wants to undertake any due diligence with respect to the Acquired Assets (as defined in the Sale Agreement) (or any other assets of the Debtor), such proposed bidder must execute a confidentiality agreement in form and substance acceptable to the Debtor prior to undertaking any such due diligence and all such due diligence must be undertaken and completed prior to the Alternative Bid Deadline;

c.  Qualified Alternative Bid. Only alternative bids that meet with the following qualifications will be considered a "Qualified Alternative Bid" by the Debtor. To be a Qualified Alternative Bid, the bid must:

   i.  be submitted on of before the Alternative Bid Deadline and served in accordance with these Bid Procedures;

   ii.  identify the proponent of the proposed bidder and an officer who is authorized to appear and act on behalf of the bidder;

   iii.  propose in writing an all cash transaction to purchase not less than all of the Acquired Assets that the Debtor determines, in the good faith opinion of the Board of Directors of the Debtor, is not materially more burdensome or conditional than the terms of this Sale Agreement and has a value greater than or equal to the sum of (x) the Purchase Price plus (y) in the case of the initial Qualified Alternative Bid, $100,000, and in the case of any subsequent Qualified Alternative Bids, $50,000 over the immediately preceding Qualified Alternative Bid;

   iv.  consist of an agreement in the form of Sale Agreement, marked to show conforming changes thereto to the Purchase Price and the identity of the purchaser, and that is on terms and

conditions no less favorable to the Debtor than the terms and conditions contained in the Sale Agreement, including but not limited to, price and time of closing;

v.  not be subject to termination by such bidder, except on the same terms as the Sale Agreement;

vi.  be accompanied by relevant financial information for the prospective bidder to enable the Debtor, any creditors' committee appointed in this case, and the Purchaser to determine such bidder's creditworthiness and ability to close a sale of the Asset Sale; and

vii.  not be conditional on the outcome of any unperformed due diligence by the bidder, the receipt of equity or debt financing, or the approval of any Board of Directors, shareholder, or other corporate approval.

d.  <u>Auction, Bidding Increments</u>.

i.  If the Debtor receives a Qualified Alternative Bid, the Debtor shall conduct an auction (the "Auction") at the offices of the Halperin & Associates or telephonically, on the Business Day immediately prior to the Sale Hearing, beginning at 11:00 a.m. (ET) or such later time or other place as the Debtor shall notify all bidders who have submitted Qualified Alternate Bids. Only Purchaser, the Debtor, any representative of any official committee appointed in the Chapter 11 case and any bidders who have timely submitted Qualified Alternate Bids shall be entitled to attend the Auction, and only Purchaser and any entity(ies) making a Qualified Alternate Bid shall be entitled to make any additional bids ("Subsequent Bids") at the Auction. All bidders shall be entitled to be present for all bidding with the understanding that all material terms of each bid will be fully disclosed to all other bidders throughout the entire Auction. The Debtor may announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent alternative bids) for conducting the Auction so long as such rules are not inconsistent with these Bidding Procedures.

ii.  At the Auction, bidding shall begin with the current highest Qualified Alternative Bid and continue in minimum increments of at least $25,000 higher than the previous bid. The Auction shall continue in one or more rounds of bidding and shall

conclude after each participating bidder has had the opportunity to submit additional Subsequent Bids with full knowledge of the then existing highest bid.  At the conclusion of the bidding, the Debtor shall announce its determination as to the bidder submitting the successful bid, which shall be submitted to the Bankruptcy Court for approval at the Sale Hearing.  Purchaser shall be deemed a party-in-interest with standing to appear and be heard in connection with any motion, hearing, or other proceeding relating to the Sale Agreement and any alternative bid or Subsequent Bids.

iii.   If the Debtor does not receive any Qualified Alternative Bids, the Debtor will report the same to the Bankruptcy Court and will proceed with a sale and assignment of the Acquired Assets to Purchaser at the Sale Hearing.

## EXHIBIT A

      BILL OF SALE dated October ___, 2002, from Ocean Power Corporation, a Delaware corporation (hereinafter called "Seller"), to Algonquin Capital Management L.L.C., a Connecticut limited liability company (hereinafter called "Purchaser").

      Purchaser and Seller are parties to the Asset Purchase Agreement dated as of October __, 2002 (the "Agreement"). All defined terms used herein but not defined herein shall have the meanings given to them in the Agreement.

      Seller, in consideration of the payment to it of the Purchase Price and other good and valuable consideration, hereby sells, conveys and assigns to Purchaser all of its rights, title and interest to and under the Assets.

      IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the day and year first above written:

OCEAN POWER CORPORATION

WITNESS:

_____    By:_____

                                                    Name:

                                                    Title:

9335599.4

## **ASSIGNMENT**

WHEREAS, Ocean Power Corporation (hereinafter "Assignor") is the owner of the entire right, title and interest in and to certain assets, including intellectual property assets, set forth on Schedule 1.1 (the "Assets");

WHEREAS, Algonquin Capital Management L.L.C., a Connecticut limited liability company, having a place of business at 440 Main Street, Ridgefield, CT 06877, (hereinafter "Assignee") Hibernia is desirous of acquiring the entire right, title and interest in and to said above identified Assets;

NOW, THEREFORE, TO ALL WHOM IT MAY CONCERN, be it known that for valuable consideration, the receipt and sufficiency of which is hereby acknowledged by said Assignor, Assignor has, pursuant to a separate agreement between the parties, sold, assigned, and transferred, and by these presents does sell, assign, and transfer unto the said Assignee, the entire right, title and interest in and to said Assets referred to herein, to have and to hold for the sole and exclusive use and benefit of the said Assignee, its successors and assigns, together with all claims, rights of action and causes of action for past, present or future infringement or unauthorized use of said Assets, if any, including, but not limited to, the right to recover all damages, income, royalties, profits, payments due or payable as of the date hereof or thereafter, and all other available relief for such infringement, and the right to sue for, and collect the same for its own use and enjoyment, and the use and enjoyment of its successors, assigns or other legal representatives.

And the Assignor does hereby covenant and agree, for themselves and their legal representatives, that they will assist said Assignee in the prosecution of any applications to reissue or reexamine said Assets referred to herein and any continuations, continuations-in-part, divisions and extensions thereof; in vesting in the said Assignee exclusive title in and to said

9335599.4

Assets referred to herein and in any reissues, reexaminations, continuations, continuations-in-part, divisions and extensions thereof; and in the prosecution of any interference or infringement action which may arise involving said Assets herein referred to herein; and Assignor will execute and deliver to the said Assignee any and all additional papers which may be requested by said Assignee to vest title in said Assignee in said Assets referred to herein, and will otherwise fully carry out the terms of this agreement.

      IN TESTIMONY WHEREOF, the said Assignor has hereunto set his hand and affixed his seal.

OCEAN POWER CORPORATION

Date:_____

By:_____
    Name:
    Title:

9335599.4

STATE OF _____    )
                         )SS
COUNTY OF _____     )

        I, _____, a Notary Public in and for the county and state aforesaid, do hereby certify that _____, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act for the uses and purposes therein set forth.

        IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this _____ day of _____, 2002.

_____
                 Notary Public

My Commission Expires:

_____
SEAL